### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | CIVIL CASE NO.:  1:05CV02041 |
| v. | ) | JUDGE:  Emmet G. Sullivan |
| | ) | DECK TYPE: Antitrust |
| CAL DIVE INTERNATIONAL, INC., | ) | DATE STAMP:  October 20, 2005 |
| STOLT OFFSHORE S.A., | ) | |
| STOLT OFFSHORE, INC., and | ) | |
| S&H DIVING, LLC, | ) | |
| | ) | |
| *Defendants.* | ) | |

### COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

### I.  Nature and Purpose of the Proceeding

Defendant Cal Dive International, Inc. ("Cal Dive") and defendants Stolt Offshore, Inc. and

S&H Diving, LLC (collectively "Stolt") entered into an Asset Purchase Agreement dated

April 11, 2005, pursuant to which Cal Dive will acquire certain assets from Stolt, including a

number of diving support vessels, saturation diving systems, and other assets used by Stolt to

provide saturation diving services in the United States Gulf of Mexico.  The United States filed a

civil antitrust Complaint on October 18, 2005, seeking to enjoin the proposed acquisition.  The

Complaint alleges that the likely effect of this acquisition would be to reduce competition substantially for saturation diving services in the United States Gulf of Mexico in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. As a result, purchasers of these services likely would face higher prices and reduced service.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, Cal Dive is required to divest the vessel designated as the Seaway Defender, the vessel designated as the Midnight Carrier, and the saturation diving system designated as the Torch Saturation Diving System (collectively, the "Saturation Diving Assets"). Under the terms of the Hold Separate Stipulation and Order and proposed Final Judgment, Cal Dive will take certain steps to ensure that, prior to such divestiture, the Saturation Diving Assets will remain independent of the rest of Cal Dive's assets and will be maintained in the same condition and state of repair as of the date Cal Dive acquired them, and that competition is maintained during the pendency of the ordered divestiture.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. Description of the Events Giving Rise to the Alleged Violation

### A.   The Defendants and the Proposed Transaction

Cal Dive is a corporation organized and existing under the laws of the state of Minnesota. Its corporate headquarters are located in Houston, Texas, and its primary subsea and marine services operations are based in Morgan City, Louisiana. Cal Dive provides a full range of marine contracting services, which includes marine construction, robotic services, manned diving, and decommissioning services, in both shallow and deep water. Cal Dive employs more than 300 full-time supervisors, divers, tenders and support staff, making it the largest provider of diving services in the United States Gulf of Mexico. Cal Dive's total revenues in 2004 exceeded $540 million, including more than $45 million for saturation diving services in the United States Gulf of Mexico.

Stolt Offshore, Inc., with headquarters in Houston, Texas, is a corporation organized and existing under the laws of the state of Louisiana. S&H Diving, LLC, is a Louisiana limited liability company, with offices in Houston, Texas. Stolt Offshore S.A., the ultimate parent of both Stolt Offshore, Inc. and S&H Diving, LLC, is a major international marine contractor registered in Luxembourg, with 2004 revenues in excess of $1.2 billion worldwide. In the United States Gulf of Mexico, Stolt offers construction and installation engineering services for conventional pipelines; subsea tiebacks; heavy lift salvage; and subsea inspection, maintenance and repair services. Stolt is one of the largest providers of saturation diving services in the United States Gulf of Mexico. In 2004, Stolt had revenues in excess of $30 million from saturation diving services in the United States Gulf of Mexico.

3

Pursuant to the April 11, 2005 Asset Purchase Agreement, Cal Dive will acquire, among other assets, all of the saturation diving systems, diving support vessels and related equipment currently used by Stolt to provide saturation diving services in the United States Gulf of Mexico. The total purchase price is approximately $125 million dollars.

The proposed transaction, as initially agreed to by Defendants, would reduce competition substantially for saturation diving services in the United States Gulf of Mexico. This acquisition is the subject of the Complaint and proposed Final Judgment filed by the United States on October 18, 2005.

### B.    The Saturation Diving Services Industry

Much of the world's oil and gas reserves are located in offshore areas, including in the United States Gulf of Mexico. Marine contractors design, engineer, fabricate, and install offshore drilling and production rigs, platforms, and other structures, which are used to extract crude oil and natural gas from commercially significant subsea reservoirs. Marine contractors, using pipelay vessels, also install undersea pipelines that transport crude oil, natural gas and other natural resources from the production sites offshore and onshore.

Human divers perform a wide variety of services for marine contractors and owners and operators of offshore pipelines, platforms and other structures. Divers are used for subsea construction projects, for subsea inspection, maintenance and repair services, and for recovery and salvage after structures are damaged by weather or accident. Divers can perform these services either by surface diving or saturation diving.

Surface divers can perform diving services only in relatively shallow depths, generally not

4

deeper than 150 feet of sea water. Surface divers must go through a time-consuming decompression process following each dive to allow their bodies to adjust to the lower pressure that exists at the surface.

Saturation divers can work for prolonged periods and at much greater depths, without undergoing decompression after each dive. During saturation diving operations, divers live for as long as several weeks in airtight chambers aboard diving vessels. The pressure in those chambers is maintained at a level that is equivalent to the pressure at the subsea work site. The divers travel from the saturation chamber to the subsea work site in similarly pressurized closed capsules called bells that allow the divers to remain at constant pressure during their descent to the sea floor.

Saturation diving systems are typically rated to allow divers to work at depths between 600 and 1,000 feet of sea water. A saturation diving system typically consists of one or more saturation chambers, one or more diving bells, and related safety, monitoring and life support systems and equipment. Saturation diving systems can be permanently installed on a vessel, or they can be portable, in which case they can be transported from one vessel to another.

A vessel must maintain a fixed position during a saturation dive. This can be accomplished either by anchor-and-chain mooring systems, which require surveyors to determine the appropriate anchor placement, or through dynamic positioning systems, which position vessels using satellite technology. Generally, vessels positioned by anchor and chain mooring systems operate in shallower waters. Vessels with dynamic positioning systems are more often used in deeper water, in areas with many pipelines on the sea floor and in hazardous weather conditions.

5

Some saturation diving projects require a dynamically positioned vessel.  Other projects can be executed using either mode of positioning.

### C.   The Competitive Effects of the Transaction on Saturation Diving Services in the United States Gulf of Mexico

Cal Dive's proposed acquisition of the Saturation Diving Assets will substantially reduce competition for saturation diving services in the United States Gulf of Mexico.  Saturation diving services are the provision of human diving services utilizing saturation diving systems. Providers and customers of saturation diving services analyze the specific characteristics of a saturation diving project to determine which resources, such as dynamically positioned vessels or saturation chambers of a particular size, are required or are most economical for completing the project.  Saturation diving service providers often bid against one another for projects, and are relatively more constrained in the prices they can charge for a particular project by competitors who have comparably more suitable resources available for completing that project.

Surface diving is not a safe or cost-effective substitute for saturation diving services for projects that utilize divers at substantial depths or for extended periods.  Other underwater technologies, such as remotely operated vehicles or atmospheric diving suits, have significant practical, technical and cost limitations that prevent them from being viable alternatives to saturation diving.

Cal Dive and Stolt compete with one another for the provision of saturation diving services in the United States Gulf of Mexico.  In the event of an increase in the price of saturation diving services in the United States Gulf of Mexico, it is unlikely that a sufficient number of other

6

providers of saturation diving services operating outside the United States Gulf of Mexico would bid their services inside the United States Gulf such that a price increase would be unprofitable. Therefore the relevant geographic market where the transaction will substantially reduce competition for saturation diving services is the United States Gulf of Mexico.

Cal Dive and Stolt are the two of the largest providers of saturation diving services in the United States Gulf of Mexico. Their combined market share in that market, measured on the basis of the number of saturation diving systems used in the United States Gulf of Mexico, is approximately 50 percent.

Customers of saturation diving services in the United States Gulf of Mexico have benefitted from competition between Cal Dive and Stolt. Cal Dive and Stolt each possess similar types of saturation diving systems and vessels that provide the two companies the ability to effectively bid against one another for a wide variety of saturation diving jobs, including those that call for dynamically positioned vessels and those that call for vessels equipped with anchor-and-chain mooring systems. Many customers consider Cal Dive and Stolt to be the two most attractive competitors for saturation diving services in the United States Gulf of Mexico because of their size, vessels, experience, and reputation for safety. The two companies often directly compete against one another for particular projects, bidding similar combinations of resources. This direct and close competition has resulted in lower prices and higher quality in saturation diving services than would otherwise have existed.

The transaction would increase substantially concentration in the market for saturation diving services in the United States Gulf of Mexico. As measured by the Herfindahl-Hirschman

7

Index ("HHI"), which is commonly employed in merger analysis and is defined and explained in Appendix A to the Complaint, the proposed transaction would increase the HHI relating to the number of saturation diving systems by more than 1100, resulting in a post merger HHI of approximately 3000.

By eliminating competition between Cal Dive and Stolt, the transaction would reduce the number of significant competitors in the market for saturation diving services in the United States Gulf of Mexico from three to two. This loss of competition increases the likelihood of unilateral action by Cal Dive to increase prices and diminish the quality or quantity of services, or of coordinated action by the remaining players in the market to achieve the same ends.

Entry by a new saturation diving services provider or expansion by an existing fringe competitor would be difficult, time consuming and expensive. It would require obtaining saturation diving systems, suitable vessels and related equipment, as well as the divers and other personnel necessary to provide saturation diving services. It also would require establishing the operational experience and reputation for safety demanded by customers in the market. Redeployment of saturation diving assets from outside the United States Gulf of Mexico is unlikely to constrain a price increase in the relevant market. Therefore, new entry or expansion would not be timely, likely, or sufficient to thwart the competitive harm of the proposed acquisition.

For these reasons, the United States concluded that Cal Dive's proposed acquisition of the Saturation Diving Assets will likely substantially lessen competition, in violation of Section 7 of the Clayton Act, in the provision of saturation diving services in the United States Gulf of

Mexico.

### III. <u>Explanation of the Proposed Final Judgment</u>

#### A.    Divestiture

The divestiture requirements of the proposed Final Judgment will maintain competition for

saturation diving services in the United States Gulf of Mexico by allowing independent

competitors to acquire the Saturation Diving Assets.  The proposed Final Judgment requires Cal

Dive to divest the portable saturation diving system designated the Torch Saturation Diving

System and the vessel designated as the Midnight Carrier, an anchor-and-chain mooring vessel

capable of accommodating a portable saturation diving system, within sixty (60) calendar days

after the filing of the Complaint in this matter, or or within five (5) days after notice of the entry

of this Final Judgment by the Court, whichever is later, and to divest the vessel designated as the

Seaway Defender, a dynamically positioned vessel with a built-in saturation diving system,

within ninety (90) days after the filing of the Complaint in this matter, or within five (5) days

after notice of the entry of this Final Judgment by the Court, whichever is later.  The United

States may extend each time period available to Cal Dive to complete the divestiture up to an

additional thirty (30) days.

The Saturation Diving Assets must be divested in such a way as to satisfy the United

States, in its sole discretion, that the Saturation Diving Assets will be operational or made

operational by the acquirer or acquirers and will be used by the acquirer or acquirers as part of a

viable, ongoing business engaged in the provision of saturation diving services in the United

States Gulf of Mexico.  Cal Dive must take all reasonable steps necessary to accomplish the

9

divestiture quickly and shall cooperate with prospective purchasers. The Defendants must also provide acquirers information relating to personnel that are or have been involved, at any time since June 1, 2004, in the operation of, or provision of diving services by, the Saturation Diving Assets, including divers, diving tenders, and diving supervisors or superintendents. The Defendants further must refrain from interfering with any negotiations by the acquirer or acquirers to employ any of the personnel that are or have been involved in the operation of, or provision of diving services by, any of the Saturation Diving Assets.

The proposed Final Judgment also requires Cal Dive, for a period of three years after the entry of the Final Judgment, to provide advance notice to the Department of Justice before acquiring any saturation chamber that has been operated in or located in the United States Gulf of Mexico at any time since October 1, 2002, whether as part of a portable saturation diving system or as part of a saturation diving system built into a vessel, or any interest in any company that owns or operates such a saturation chamber. Further, the proposed Final Judgment restricts Cal Dive from reacquiring any of the Saturation Diving Assets during the term of the proposed Final Judgment.

### B.    Use of a Divestiture Trustee

In the event that Cal Dive does not accomplish the divestitures within the periods prescribed in the proposed Final Judgment, the proposed Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestitures. If a trustee is appointed, the proposed Final Judgment provides that Cal Dive will pay all the costs and expenses of the trustee. The trustee's commission will be structured so as to provide an incentive

10

for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture. At the end of six months, if the divestiture has not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

The divestiture provisions of the proposed Final Judgment will eliminate the anticompetitive effects of the proposed acquisition. The divestitures of the Saturation Diving Assets will preserve competition in the market for saturation diving services by maintaining an independent and economically viable competitor in the United States Gulf of Mexico.

## IV. Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V. Procedures Available for Modification of the Proposed Final Judgment

The United States and Defendants have stipulated that the proposed Final Judgment may

11

be entered by the Court after compliance with the provisions of the APPA, provided that the

United States has not withdrawn its consent. The APPA conditions entry upon the Court's

determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the

proposed Final Judgment within which any person may submit to the United States written

comments regarding the proposed Final Judgment. Any person who wishes to comment should

do so within sixty (60) days of the date of publication of this Competitive Impact Statement in

the Federal Register. All comments received during this period will be considered by the

Department of Justice, which remains free to withdraw its consent to the proposed Final

Judgment at any time prior to the Court's entry of judgment. The comments and the response of

the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

Donna N. Kooperstein
Chief, Transportation, Energy & Agriculture Section
Antitrust Division
United States Department of Justice
325 Seventh Street, NW, Suite 500
Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action,

and the parties may apply to the Court for any order necessary or appropriate for the

modification, interpretation, or enforcement of the Final Judgment.

## VI. <u>Alternatives to the Proposed Final Judgment</u>

The United States considered, as an alternative to the proposed Final Judgment, a full trial

12

on the merits against Defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Cal Dive's acquisition of certain Stolt assets. The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will preserve competition in the market for saturation diving services in the United States Gulf of Mexico.

### VII. <u>Standard of Review Under the APPA for the Proposed Final Judgment</u>

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty (60) day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court shall consider:

> (A)     the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)     the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). As the United States Court of Appeals for the District of Columbia Circuit has held, the APPA permits a court to consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See United*

*States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995).

"Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). Thus, in conducting this inquiry, "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).[1]  Rather:

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

*United States v. Mid-America Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977).

Accordingly, with respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648

---

[1]  *See United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (recognizing it was not the court's duty to settle; rather, the court must only answer "whether the settlement achieved [was] within the reaches of the public interest"). A "public interest" determination can be made properly on the basis of the Competitive Impact Statement and Response to Comments filed by the Department of Justice pursuant to the APPA. Although the APPA authorizes the use of additional procedures, 15 U.S.C. § 16(f), those procedures are discretionary. A court need not invoke any of them unless it believes that the comments have raised significant issues and that further proceedings would aid the court in resolving those issues. *See* H.R. Rep. No. 93-1463, 93rd Cong., 2d Sess. 8-9 (1974), reprinted in 1974 U.S.C.C.A.N. 6535, 6538-39.

F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2]

The proposed Final Judgment, therefore, should not be reviewed under a standard of whether it is certain to eliminate every anticompetitive effect of a particular practice or whether it mandates certainty of free competition in the future. Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. AT&T Corp.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F. Supp. at 716), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F.Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).

---

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *Gillette*, 406 F. Supp. at 716 (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"); *see generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60.

## VIII. Determinative Documents

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: October 20, 2005

Respectfully submitted,

Jennifer L. Cihon (OH Bar #0068404)
Angela L. Hughes (DC Bar #303420)
John M. Snyder (DC Bar #456921)
Bethany K. Hipp (GA Bar #141678)

16

# CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2005, I caused a copy of the foregoing Competitive

Impact Statement to be served on counsel for defendants in this matter in the manner set forth

below:

By electronic mail and hand delivery:

Counsel for Defendant Cal Dive International, Inc.
Daniel L. Wellington  (D.C. Bar #273839)
Neely B. Agin (D.C. Bar #456005)
Fulbright & Jaworski LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2623
Tel: (202) 662-4574
Fax: (202) 662-4643

Counsel for Defendants Stolt Offshore S.A., Stolt Offshore, Inc.
and S&H Diving LLC
Paul C. Cuomo (D.C. Bar #457793)
Sean F. Boland (D.C. Bar #249318)
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, D.C.  20004-2402
Tel: (202) 783-0800
Fax: (202) 383-6610

Jennifer L. Cihon (OH Bar #0068404)
Department of Justice
Antitrust Division
325 Seventh Street, N.W.
Suite 500
Washington, DC  20530
(202) 307-3278
(202) 616-2441 (Fax)